IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

NANCY BROWN o/b/o JK,

                                    Plaintiff,

          vs.                                    Civ. Action No.
                                                 5:05-CV-0633 (GLS/DEP)

MICHAEL J. ASTRUE, Commissioner
of Social Security,[1]

                                    Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

OLINSKY & DIMARTINO                   JAYA A. SHURTLIFF, ESQ.
Historical First National Bank Bldg.
186 West First Street
Oswego, NY 13126

FOR DEFENDANT:

HON. GLENN T. SUDDABY                 WILLIAM H. PEASE, ESQ.
United States Attorney for the        Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, NY 13261-7198

_____

[1]      Plaintiff's complaint, which was filed on May 24, 2005, named Jo Anne B.
Barnhart, the former Commissioner of Social Security, as the defendant.  On February
12, 2007, Michael J. Astrue took office as Social Security Commissioner.  He has
therefore been substituted as the named defendant in this matter pursuant to Rule
25(d)(1) of the Federal Rules of Civil Procedure, and no further action is required in
order to effectuate this change.  *See* 42 U.S.C. § 405(g).

OFFICE OF GENERAL COUNSEL  BARBARA L. SPIVAK, ESQ.
Social Security Administration  Chief Counsel, Region II
26 Federal Plaza
New York, NY 10278     JENNIFER S. ROSA, ESQ.
            Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## <u>REPORT AND RECOMMENDATION</u>

This action was commenced by Nancy Brown on behalf of her minor son, JK, seeking judicial review of an administrative determination denying her son's application for children's supplemental security income ("SSI") benefits under the Social Security Act.  Plaintiff contends that JK suffers from attention deficit hyperactivity disorder ("ADHD"), a learning disorder affecting the areas of reading and written expression; migraine headaches associated with nausea, vomiting and aura; and an eating disorder, resulting in morbid obesity, and that this combination of conditions renders him disabled within the meaning of the Act.  Plaintiff challenges a contrary conclusion by the administrative law judge ("ALJ") assigned by the agency to hear and decide the matter as being fatally flawed, in light of his failure to consider the marked effects of JK's condition upon his abilities to acquire and use information and to attend and complete tasks – two of the six relevant domain areas for assessing childhood disability.

2

Based on a thorough and careful review of the record in this case, considered in light of the plaintiff's arguments, I find that the Commissioner's determination was based upon the application of proper legal principles, and is supported by substantial evidence.

I.    BACKGROUND

JK was born on June 22, 1993; at the time of the administrative hearing in this matter, he was just shy of eleven years old.  Administrative Transcript at 55, 253.[2]  JK resides with his mother and two sisters, and receives fifty dollars of child support monthly from his father, who lives nearby.  AT 56, 100, 209.  By all accounts, JK suffers from obesity, *see, e.g.*, AT 196; in his decision, the ALJ noted that JK is five feet three inches tall, and weighs approximately two hundred pounds.  AT 24.

A.    School Records

JK has been a student at the Salem Hyde Elementary School, a public educational facility operated by the Syracuse City School District, since kindergarten.   AT 96, 100.  At the time of hearing, plaintiff was enrolled in the fifth grade.  AT 22.  During his formative years at Salem Hyde, JK manifested some difficulties in school.  Those problems led

---

[2]    Portions of the Administrative Transcript (Dkt. No. 6), which was filed by the Commissioner together with the agency's answer, will be cited as "AT ___."

school officials to recommend JK's retention in both first and second grades, although ultimately he was not held back on either occasion, as a result of parental objections.  AT 100.  JK was observed by school psychologist Ann L. Drummond on March 21, 2002.  AT 93.  Based upon her observations, Dr. Drummond reported that JK was able to attempt assigned tasks and complete them, sometimes attending to tasks independently.  *Id.*  The psychologist also noted that JK is sometimes impulsive and "calls out answers" before being called on.  *Id.*

On June 12, 2002, JK was referred by his classroom teacher, Ms. Tamara Felicia, to the Salem Hyde Committee on Special Education ("CSE") as functioning two years below grade level.  AT 118.  One day later, a "social history report" concerning JK was completed for the District by social worker Linda Kenney.  AT 96.  In that report, Ms. Kenney listed her concerns as "academics, especially reading" and, at the request of JK's mother, included "behavior" as a concern.  *Id.*  The author of that report noted that JK's general health was good, but that an "ADHD evaluation [was] in process" at Upstate Pediatrics.  AT 98.

School psychologist Drummond submitted a psychological report, dated July 10, 2002, in connection with the CSE's evaluation of JK.  AT

4

99-106.  According to that report, JK scored in the average range for testing of verbal and visual/spacial/perceptual abilities when administered the Wechsler Intelligence Scale for Children - Third Edition ("WISC III"), and revealed an average overall level of cognitive functioning.  AT 102. Dr. Drummond noted that JK scored in the low average range in raw written language, and was characterized as a slow learner in broad reading.  AT 103.  Based upon her analysis, Dr. Drummond recommended that JK be classified as "learning disabled in reading" and enrolled in a resource room program, and additionally receive modifications of testing procedures.  AT 105.

The Salem Hyde Elementary School CSE met on September 30, 2002 to discuss JK and prepare an individualized education program ("IEP") for him.  AT 166.  In the resulting IEP, which was finalized on or about October 30, 2002, Dr. Drummond's suggestion for classification was accepted, and JK was prescribed services which included one hour of resource room assistance daily, as well as the recommended testing modifications.  AT 166-70.  In the IEP it was noted that "[JK] is a student with solid average intelligence . . . . His weakest area is reading fluency," and that "[JK] has difficulty staying with a task and focusing." AT 167-68.

5

In April 2004, the CSE conducted a routine, annual review of JK's progress under his IEP.  AT 176.  In a report of that evaluation the committee noted that JK continued to suffer from the reading fluency and writing difficulty, but had demonstrated improvement in math. AT 177. Based upon the committee's findings, JK's accommodations were renewed for another year.  AT 180.

On May 20, 2004, JK's fifth grade classroom teacher, Ms. Dunn, and his Resource Room teacher, Ms. Donzella, prepared a report of JK's capabilities utilizing a form entitled "Functional Report for Children," which was tailored to measure eligibility for childrens' Social Security benefits. *See* AT 185-91.  In their report, the two teachers described JK as "unable or unwilling to think through a problem" and noted that "[i]nstructions need to be repeated over and over for him to communicate to others."  AT 189. The two described JK as immature for his age and reported that he "exhibits paranoid tendencies and often accuses students of laughing at him," concluding that he displayed marked limitations in cognitive functioning, the ability to learn new skills, and concentration, persistence, and pace, but moderate or less than moderate limitations in all areas of personal and behavioral function.  AT 186-90.

B.    Medical Records

According to the record, JK has been seen on various occasions at the State University of New York, Upstate Medical University ("SUNY Upstate") for treatment of both his suspected ADHD and migraine headaches.  Plaintiff was examined there by Dr. Zahi Haidar on May 21, 2002.  AT 197.  On that occasion, JK's parents reported that they suspected the presence of ADHD, but noted that JK was doing well in school.  *Id.*

Plaintiff was seen at SUNY Upstate by Dr. Brad Olsen on June 3, 2002 for evaluation of obesity and ongoing concerns of suffering from ADHD.  AT 198.  During that examination obesity was noted, and both JK and his family were counseled regarding dietary control.  *Id.*  The possibility that JK suffered from ADHD was also discussed during that visit, and his family was provided with an initial ADHD evaluation packet. *Id.*

Follow-up evaluation of JK by Dr. Haidar for the presence of ADHD was conducted on June 17, 2002, revealing inattentiveness and mild hyperactivity.  AT 200.  At that time JK was diagnosed as suffering from attention deficit disorder, with a possible secondary learning disability.  *Id.*

7

Ritalin was prescribed by Dr. Haidar, and rating scales were provided to JK's parents and teachers for reevaluation, taking into the account the affects of the Ritalin.  Plaintiff later reported to Dr. Haidar on July 17, 2002 that JK was better when taking the medication and had shown improvement while on the medication in both school and at home.  AT 202.

JK has also been seen at SUNY Upstate by Dr. Haidar and others for complaints of migraine headaches, dating back at least to September 18, 2002.  AT 204-05.  JK was initially prescribed Motrin for his headaches.  AT 205.  On December 16, 2002, however, based upon their persistence, as well as the presence of certain behavioral problems, JK was referred to a mental health clinic.  AT 207.

According to the medical records which were before the agency, JK's migraine headaches have persisted despite treatment.  Those records reveal that JK was again examined for migraine headaches in October of 2003; treatment notes from that visit reflect JK's characterization of his headaches as involving nausea, vomiting and severe pain, together with an aura.  AT 235.  While Motrin was again prescribed for JK's headaches, *id.,* JK was later started on Periactin and

8

Maxalt on October 8, 2003 to address that condition.  AT 233-34.

In May of 2004, JK recounted that his headaches were occurring between two and three times each week, even when on Maxalt.  AT 223. It was also reported that while JK typically sleeps from 9:00 p.m. until 7:30 a.m. he snores and often awakes unrested.  *Id.*  At that time JK was referred for sleep study, and asked to keep a headache diary.  AT 221.

A childhood disability evaluation form, addressing JK's condition and limitations, was completed by Dr. J. Randall on November 15, 2002. AT 216.  In that report, Dr. Randall considered the potential limitations resulting from JK's ADHD, learning disorder, and migraines, and determined that the "impairment or combination of impairments is severe, but does not meet, medically equal or functionally equal the listings." AT 215.  Dr. Randall found no limitation in the domains of interacting and relation with others, moving about and manipulating objects, and caring for oneself.  AT 217-18.  In addition, Dr. Randall found a less than marked limitation in the areas of acquiring and using information, attending and completing tasks, and health and physical well-being.  *Id.*

In October of 2002, JK was examined by psychologist Jeanne A. Shapiro. AT 209-12.  At that time, while noting that JK still manifested

9

some symptoms of ADHD, his mother reported to the examiner that Ritalin had significantly improved his symptoms.   AT 209-10.  At the time of the exam, JK exhibited appropriate personal hygiene and grooming, with normal motor behavior, gait, and posture.  AT 210-11.  While school testing had revealed below average reading and writing skills, it was reported that JK had intact attention and concentration, and was able to count and do simple calculations in his head.  *Id.*  Ms. Shapiro stated that the results of her examination of JK were consistent with a diagnosis of ADHD, but that the condition did not appear to interfere significantly with his ability to function on a daily basis.  AT 212.

During the hearing JK testified regarding his schooling and typical daily activities.  JK acknowledged that at the time he was in the fifth grade, and was given one hour of resource room assistance each day which focused upon reading and writing.  AT 254, 258.  JK recounted that he does well in math, but poorly in reading.  AT 254-55.  JK noted that he is able to dress for school on his own.  AT 256-57.  JK does his homework each day after getting home from school, and then cleans his room.  AT 259.

Typically, JK is able to play outside with friends and, after dinner,

10

showers and goes to bed.  AT 260-61.  Among the homework done by JK

is the reading of books assigned at school.  AT 261-62.  JK reports that he

is able to get along well with his parents and siblings as well as friends,

although he did note that he has difficulty getting along with classmates

who call him names.  AT 263-64.

II.    PROCEDURAL HISTORY

    A.    Proceedings Before The Agency

On September 9, 2002 plaintiff filed a claim for SSI benefits on JK's

behalf, asserting a protective filing date of July 23, 2002.  AT 55-57.

Following the denial of that application at the initial level, AT 29-33, a

hearing was conducted on June 2, 2004, at plaintiff's request, before ALJ

Alfred R. Tyminski.  *See* AT 248-77. During that hearing, at which plaintiff

was represented by counsel, testimony was elicited from both JK and his

mother, Nancy Brown.  *See id.*

Following the hearing, ALJ Tyminski issued a decision dated

November 16, 2004, finding that JK was not disabled, and accordingly

denying plaintiff's application on his behalf for SSI benefits.  AT 22, 27-28.

In his decision, after engaging in a *de novo* review of the evidence before

the agency, the ALJ applied the governing, three-step test for determining

childhood disability, finding first that JK has not engaged in substantial gainful activity since the date of his application, and that he suffers from impairments, including ADHD, migraines, and obesity, of sufficient severity to satisfy step two of the controlling test.   AT 22, 27.  The ALJ went on to conclude, however, that JK's conditions did not meet or medically equal any of the listed, presumptively disabling conditions set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. B.  *See* AT 27.

Proceeding to step three, the ALJ addressed the six focal areas in the functional equivalency calculus.  AT 23, 25-27.  Addressing those areas, based upon the record before him, ALJ Tyminski found no extreme or marked limitation in any of the six relevant domains.  AT 25-27.  ALJ Tyminski therefore concluded that JK was not disabled, and accordingly ruled him ineligible for SSI benefits.  AT 28.

The ALJ's determination became final on April 14, 2005, when the Social Security Administration Appeals Council denied plaintiff's request for a review of that decision.  AT 4-6.

B.    This Action

Plaintiff commenced this action on May 24, 2005.  Dkt. No. 1.  Issue was thereafter joined by the Commissioner's filing of an answer,

accompanied by an administrative transcript of the proceedings before the

agency, on September 13, 2005.  Dkt. Nos. 5,6.  With the filing of plaintiff's

brief on October 28, 2005, Dkt. No. 7, and of a brief on behalf of the

Commissioner, Dkt. No. 8, the matter is now ripe for determination, and

has been referred to me for the issuance of a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York

Local Rule 72.3(d).[3]  *See also* Fed. R. Civ. P. Rule 72(b).

III.   DISCUSSION

A.   Scope Of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart,* 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir. 2000); *Schaal

v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp.

---

[3]     This matter has been treated in accordance with the procedures set forth
in General Order No. 18 (formerly, General Order No. 43) which was issued by the
Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998,
and subsequently amended and reissued by Chief District Judge Frederick J. Scullin,
Jr., on September 12, 2003.  Under that General Order an action such as this is
considered procedurally, once issue has been joined, as if cross-motions for judgment
on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.

2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen,* 817 F.2d
983, 985 (2d Cir. 1987)).   Where there is reasonable doubt as to whether
the Commissioner applied the proper legal standards, her decision should
not be affirmed even though the ultimate conclusion reached is arguably
supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148.  If,
however, the correct legal standards have been applied and the ALJ's
findings are supported by substantial evidence, those findings are
conclusive, and the decision should withstand judicial scrutiny regardless
of whether the reviewing court might have reached a contrary result if
acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859
F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314
(N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

    The term "substantial evidence" has been defined as "'such relevant
evidence as a reasonable mind might accept as adequate to support a
conclusion.'"  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420,
1427 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197,
229, 59 S. Ct. 206, 217 (1938)).  To be substantial, there must be "'more
than a mere scintilla'" of evidence scattered throughout the administrative
record.  *Id.*; *Martone*, 70 F. Supp. 2d at 148 (citing *Richardson*).  "To

14

determine on appeal whether an ALJ's findings are supported by

substantial evidence, a reviewing court considers the whole record,

examining the evidence from both sides, because an analysis of the

substantiality of the evidence must also include that which detracts from

its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v.

NLRB,* 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards

have been applied, and/or that substantial evidence does not support the

agency's determination, the agency's decision should be reversed.  42

U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the

court may remand the matter to the Commissioner under sentence four of

42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to

develop a full and fair record or to explain his or her reasoning.  *Martone*,

70 F. Supp. 2d at 148 (citing *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.

1980)).  A remand pursuant to sentence six of section 405(g) is warranted

if new, non-cumulative evidence proffered to the district court should be

considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and

Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without

remand, while unusual, is appropriate when there is "persuasive proof of

disability" in the record and it would serve no useful purpose to remand

the matter for further proceedings before the agency.  *Parker*, 626 F.2d at

235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir.

1992); *Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 644

(2d Cir. 1983).

> B.    Childhood Disability Determination: The Three-Step Evaluation
>        Process

In 1996 Congress significantly altered the childhood disability terrain,

for purposes of eligibility for SSI benefits under the Social Security Act, by

enacting the Personal Responsibility and Work Opportunity Reconciliation

Act of 1996 ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996).[4]

In accordance with the PRWORA, which took effect on August 22, 1996,

an individual under the age of eighteen is disabled, and thus eligible for

SSI benefits, if he or she

> has a medically determinable physical or mental
> impairment, which results in marked and severe
> functional limitations, and which can be expected
> to result in death or which has lasted or can be
> expected to last for a continuous period of not less
> than 12 months.

---

[4]    Entitlement to SSI benefits is governed by a federal program intended to
provide benefits to needy aged, blind, or disabled individuals who meet certain
statutory income and resource limitations.  42 U.S.C. § 1381; *see Schweiker v. Wilson*,
450 U.S. 221, 223, 101 S. Ct. 1074, 1077 (1981).

42 U.S.C. § 1382c(a)(3)(C)(i).  That definitional provision goes on to exclude from coverage any "individual under the age of 18 who engages in substantial gainful activity. . . ."  42 U.S.C. § 1382c(a)(3)(C)(ii).

By regulation, the agency has prescribed a three-step evaluative process to be employed in determining whether a child can meet the statutory definition of disability.  20 C.F.R. § 416.924; *Kittles v. Barnhart,* 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003).  The first step of the test, which bears some similarity to the familiar, five-step analysis employed in adult disability cases, requires a determination of whether the child has engaged in substantial gainful activity.  20 C.F.R. § 416.924(b); *Kittles,* 245 F. Supp. 2d at 488.  If so, then both statutorily and by regulation the child is ineligible for SSI benefits.  42 U.S.C. § 1382c(a)(3)(c)(ii); 20 C.F.R. § 416.924(b).

If the claimant has not engaged in substantial gainful activity, then the second step requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are severe – that is, which causes more than a minimal functional limitation.  20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at

17

488; *Ramos*, 2003 WL 21032012, at *7.  If the existence of a severe impairment is discerned, the agency must next determine whether it meets or equals a presumptively disabling condition identified in the listing of impairments set forth by regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "listings").  *Id.*  Equivalence to a listing can be either medical or functional.  20 C.F.R. § 416.924(d); *Kittles,* 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7.  If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability, and the twelve month durational requirement is satisfied, the claimant will be deemed disabled.  20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

Under final regulations which became effective on January 2, 2001, and materially altered the test dictated under the superceded interim rules, *see Kittles*, 245 F. Supp. 2d at 488-89, analysis of functionality is informed by consideration of how a claimant functions in six areas which are denominated as "domains", and described as "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8.  Those prescribed domains include

(i)    [a]cquiring and using information;

(ii)    [a]ttending and completing tasks;

(iii)    [i]nteracting and relating with others;

(iv)    [m]oving about and manipulating objects;

(v)    [c]aring for [oneself]; and

(vii)    [h]ealth and physical well-being.

20 C.F.R. § 416.926a(b)(1).  A finding of disability is warranted if a "marked" limitation, defined as when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities", 20 C.F.R. § 416.926a(e)(2)(i), is found in two of the listed domains.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. Functional equivalence also exists in the event of a finding of an "extreme" limitation, meaning "more than marked," representing an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities", 20 C.F.R. § 416.926a(e)(3)(i), in one domain.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.

C.    The Evidence In This Case

In her challenge to ALJ Tyminski's decision, plaintiff does not challenge the finding, at step three of the relevant test, that JK's

19

impairments did not, either singly or in combination, meet or establish medical equivalence to any of the impairments listed in the governing regulations.  Plaintiff does, however, challenge the ALJ's finding of no functional equivalence, contesting ALJ Tyminski's failure to properly evaluate JK's learning disability and to recognize that his impairments result in marked limitations in the areas of functioning and acquiring and using information, as well as in the category of attending to and completing tasks.[5]

### 1.   JK's Learning Disability

Plaintiff claims that the ALJ erred when he failed to evaluate and consider JK's learning disability which, she contends results in a marked impairment of JK's capacity to acquire and use information.  That domain addresses how well a child learns information, and uses the information he or she has learned.  20 C.F.R. § 416.926a(g).  Despite plaintiff's argument to the contrary, it appears that the ALJ did contemplate the effect of JK's learning disability in his discussion of this domain, AT 25,

---

[5]     In his decision, ALJ Tyminski found "less than marked" limitations in the areas of interacting and relating with others, as well as health and physical well-being, and discerned no limitations in the categories of moving about and manipulating objects and self-care.  AT 25-26.  Plaintiff does not appear to challenge these determinations.

nonetheless finding that he had "less than marked" limitations in the area. *Id*. Though JK's school work has been slightly interrupted on occasion by behavioral episodes, the record indicates that he has progressed well through the grades, and testing has revealed solid average IQ scores. *See id*.

In his decision, ALJ Tyminksi did note that the functional report completed in May of 2004 by Lorene Dunn and Stephanie Donella concluded that JK suffered from a "marked" limitation in cognitive functioning as a result of his extreme difficulty and frustration when reading. *See* AT 25. That report was rejected by the ALJ, however, as inconsistent with other evidence in the record including school records and consultative psychiatric reports, as well as JK's progress as reported in his report cards. *Id*. That rejection was both well-explained and supported by substantial evidence.

The ALJ's decision is also well-supported by the report of Dr. Jeanne Shapiro. In that report, Psychologist Shapiro estimated JK's intellectual functioning to be in the average range, and that he appeared to have an appropriate general fund of knowledge. AT 211.

In sum, while it is obvious that JK suffers from a moderate learning

disability and as a result has some difficulty with reading, the ALJ's conclusion that the condition presents less than a marked limitation in the domain on acquiring and using information is supported by substantial evidence in the record.

     2.   JK's Other Impairments

Plaintiff also claims that JK's ADHD, learning disorder and migraine headaches result in marked impairments in two domains and, accordingly, are functionally equivalent to a listed, presumptively disabling impairment. The focus of plaintiff's argument is her contention that JK suffers from a marked limitation in the domains of acquiring and using knowledge, and in attending and completing tasks.

As was discussed above, ALJ Tyminski's finding that JK's impairments do not result in a marked limitation in the domain of acquiring and using knowledge is supported by substantial evidence. Turning to the second domain, the focus of which is attending and completing tasks, I find that the ALJ's conclusion that JK suffers only a "less than marked" limitation in this arena is well supported.

The domain of attending and completing tasks gauges how well a child is able to focus and maintain attention.  20 C.F.R. § 416.926a(h).

22

From his decision it is clear that ALJ Tyminski did consider this domain, concluding that JK has less than marked limitations in the arena, and "despite occasional ADHD-based assignment deficits, the child has done fairly well in school and has advanced through the grades in a normal fashion." AT 25.

ALJ Tyminski's decision is supported by substantial evidence in the record. At the hearing, JK testified that each day he returns home from school he does his homework, and then cleans his room. AT 211, 259. After dinner, he generally takes a shower, then goes to bed. AT 260-61. JK stated that he is able to complete all these tasks on a daily basis.

JK's testimony in this regard is augmented by observations made by a school psychologist, who observed JK in class and reported that he appears to be able to attend to assigned tasks. AT 93. That finding is supported by conclusions recorded by Psychologist Shapiro, who also noted that JK is able to attend to tasks and retains intact attention and concentration. AT 211-212.

Undeniably, JK suffers from both ADHD and medically treated migraine headaches, and these conditions pose potential limitations upon his ability to attend and complete tasks. The evidence in the record

23

shows, however, that JK's ADHD has been well-controlled through use of Ritalin.  *See, e.g.,* AT 202, 206, 207, 210.  Moreover, Psychologist Shapiro has specifically opined that JK's ADHD does not significantly interfere with his ability to function on a daily basis.  AT 212.

The same holds true with regard to JK's migraine headaches.  While it is true that at least on one occasion, in October of 2003, JK was required to leave school as a result of a headache, *see* AT 233, the record also reflects that by March of 2004 his headaches were significantly reduced as a result of a prescription for Maxalt.  AT 229.

In sum, having carefully considered the evidence in the record I find that the ALJ's conclusion that JK did not suffer from a marked limitation in the area of attending and completing tasks is supported by substantial evidence.

IV.    SUMMARY AND RECOMMENDATION

While by all accounts JK suffers from ADHD, learning disabilities, and migraine headaches, those impairments do not meet or medically equal any of the listed, presumptively disabling impairments set forth in the regulations.  Turning to functional equivalence, the ALJ's finding that JK does not possess an extreme or marked limitations in any of the six

24

prescribed domain areas implicated in the functional equivalency analysis is supported by substantial evidence.  I therefore find that the ALJ's determination of no disability resulted from the application of proper legal principles and is supported by substantial evidence.  Accordingly, it is

RECOMMENDED that defendant's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability AFFIRMED, and plaintiff's complaint DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within ten (10) days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roland v. Racette*, 984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

Dated:     June 6, 2007
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

25

26